# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SCOTT H. WEST,             )
                                    )
          Plaintiff,       )
                                    )
    vs.                        )     No. 07 C 2994
                                    )     Hon. Marvin E. Aspen
                                    )
ILLINOIS STATE BOARD OF    )
EDUCATION, et al.           )
                                    )
          Defendants.    )

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Court Judge:

Presently before us is a motion for summary judgment filed by Defendants Illinois State Board of Education ("ISBE"), Christopher A. Koch, Ethelene Ferdinand, Randy J. Dunn, Robert L. Wolfe, and Donald W. Evans. Defendants contend that Plaintiff Scott West's claims under the Americans with Disabilities Act ("ADA") are barred by his execution of a settlement agreement and at least in part by the applicable statute of limitations. They further argue that the undisputed material facts adduced through discovery demonstrate that he cannot prove his case. For the reasons discussed below, we grant the motion.

## SUMMARY OF FACTS[1]

On April 15, 1986, Scott West began his employment with ISBE as a field auditor. (Pl.'s

---

[1] Unless otherwise noted, the facts described herein are undisputed and culled from the parties' Local Rule 56.1 statements of fact and exhibits. While we have evaluated the objections raised by both parties, we will not issue a separate ruling on each statement of fact. Rather, we will simply present the facts as appropriate after carefully considering the evidence presented. We rely primarily on the evidence rather than the parties' characterizations thereof. Accordingly, the pending requests to strike, including Defendants' formal motion, are denied as moot.

Facts ¶ 1; Defs.' Facts ¶ 13.)  ISBE offered West a choice of two retirement plans.  (Pl.'s
Facts ¶ 2(a).)  Although he initially belonged to the state pension plan ("SERS"), as of
November 21, 1986, he elected to participate in the Teachers Retirement System ("TRS").  (*Id.*;
Defs.' Ex. C, West Dep. I at 303–06 [hereinafter "West Dep. I"].)

### A.    West's Performance

West received annual performance evaluations beginning in 1986.  (Defs.' Facts ¶ 14.)
Several of these evaluations revealed deficiencies in West's performance, along with positive
attributes.  (*See, e.g.*, West Dep. I, Exs. 10, 13, 15–16, 19–20 (evaluations from January 1989,
May 1989, February 1991, January 1992, January 1994, and March 1995).)  Around March 1,
2002, ISBE reassigned West to the External Assurance Department, a lateral position.  (Defs.'
Facts ¶ 16; West Dep. I, Ex. 24.)  At that time, Robert Wolfe was an ISBE division supervisor
and West's direct supervisor.  (Defs.' Facts ¶ 17; Defs.' Ex. G, Wolfe Dep. at 7–8 [hereinafter
"Wolfe Dep."].)  Wolfe gave West "satisfactory performance" ratings in his March 2002 and
2003 evaluations.  (West Dep. I, Exs. 25–26.)

In early 2003, Ethelene Ferdinand became West's direct supervisor.[2]  (Defs.' Facts ¶ 17;
Defs.' Ex. H, Ferdinand Dep. at 10–12 [hereinafter "Ferdinand Dep."].)  In her March 10, 2004
review of West, Ferdinand noted West's good communication skills and interpersonal
relationships and, like Wolfe before her, indicated that further training would help West
complete his assignments in a timely manner.  (West Dep. I, Ex. 27.)  Later that year, on
approximately September 3, 2004, Ferdinand and West had a follow-up meeting to discuss the

---

[2] West disputes the precise time periods when Wolfe and Ferdinand first supervised him.
(Pl.'s Am. Resp. to Defs.' Facts ¶ 17(B)–(D).)  We find West's arguments unconvincing and,
moreover, the dispute to be immaterial.

quality of his work, and Ferdinand informed West that she had not seen "any signs of improvement." (West Dep. I at 89 & Ex. 28.)

In November 2004, Wolfe issued West an "interim unsatisfactory" performance evaluation, identifying several specific errors in West's work. (Defs.' Facts ¶ 23; West Dep. I, Ex. 29.) Ferdinand then issued West a Verbal Counseling Memorandum, confirming their discussion of the interim unsatisfactory review on November 23, 2004. (Pl.'s Facts ¶ 34; West Dep. I, Ex. 31.) On December 8, 2004, West replied to his interim review, indicating that he received only minimal training on handling certain claims at issue and outlining additional training he needed. (*Id.*, Exs. 32–33.) West and Ferdinand met on December 27, 2004 to discuss West's response and training concerns. (Defs.' Facts ¶ 26; West Dep. I, Ex. 34.)

Following a predisciplinary meeting on February 8, 2005, Wolfe issued West an "official reprimand/written warning" based on West's continued unsatisfactory performance. (West Dep. I, Exs. 35–37.) In his memorandum memorializing that meeting, Wolfe noted that West continued to "turn in assignments that require[d] repeated corrections." (*Id.*, Ex. 36.) Within the next few weeks, Ferdinand and West met for remedial training on issues identified by West. (*Id.* at 114–15, Ex. 38.) On approximately March 10, 2005, a short time after this training, Wolfe and Ferdinand gave West another unsatisfactory performance evaluation.[3] (*Id.*, Ex. 42.) In early August 2005, Wolfe scheduled a predisciplinary meeting with West to discuss deficiencies in his audit of Transportation Reimbursement claims for Huntley School District #158. (Defs.' Facts

---

[3] As with other negative reviews, West contests whether this evaluation was an accurate reflection of his performance; in this instance, he added that although his performance was improving, he could not perfect it "overnight." (*Id.*; *see* Pl.'s Resp. to Defs.' Facts ¶ 31; *see also* Pl.'s Am. Resp. to Defs.' Facts ¶¶ 22(D), 23(E), 24(D), 30©.)

¶ 32; West Dep. I, Ex. 45.) Ferdinand conducted a day of one-on-one training with West in October 2005, covering items he identified in advance of their session. (West Dep. I at 140–43, Exs. 47–48.)

Beginning on December 5, 2005, West was assigned to work out of the Springfield office to correct deficiencies in several of his audits. (West Dep. I, Ex. 50; *see* Defs.' Reply to Pl.'s Resp. to Mot. to Strike ¶ 38(A).) Although documentation suggests that West worked on corrections for approximately nine audits through early February, (West Dep. I, Ex. 50), West testified that he continued these efforts through March 2006, (West Dep. II at 68–69, 95). In Springfield, West returned corrected audits to Wolfe but sometimes was required to wait hours, or even days, to discuss revisions with Wolfe or seek clarification. (Pl.'s Am. Resp. to Defs.' Facts ¶¶ 39–40; *see* West Dep. I at 152–54; West Dep. II at 64–65, 104–05.) Auditors, like West, were not permitted to ask questions of each other. (West Dep. II at 63–64; Ferdinand Dep. at 94–95.) West thanked Ferdinand and Wolfe for their help during this period of time, as he felt that he had learned a great deal from his mistakes and their guidance.[4] (Defs.' Facts ¶ 41.)

While in Springfield, West stayed at a hotel, at least during the week. (*See* West Dep. II at 73, 110, 118–19.) He did not work on Fridays but returned to the Chicago area for the weekends, enabling him to make appointments, complete household tasks and socialize. (*Id.* at 119.) Nonetheless, as a result of his temporary stay in Springfield, West was unable to participate in all his usual activities, including for example a Wednesday night church group. (*Id.* at 72–73, 118–19.) He also had some difficulty maintaining his daily exercise routine at the

---

[4] Although the parties and the settlement agreement refer to a March 2006 unsatisfactory performance evaluation, there is no evidence of that review before us.

hotel and arranging medical appointments back in the Chicago area. (*Id.* at 109–13.) During this Springfield assignment, West's income and benefits remained the same. (*Id.* at 80–81.)

## B. West's Alleged Disability

In March 2005, shortly after receiving an unsatisfactory review and prior to his assignment to Springfield, West informed Susan Connelly, ISBE's Supervisor of Human Resources, that he might have attention deficit disorder ("ADD"). (West Dep. I, Ex. 44; Pl.'s Ex. 9; Defs.' Resp. to Pl.'s Facts, Ex. 1, Connelly Aff. ¶ 1.) By email dated March 29, 2005, West also told Wolfe that he had previously been tested for ADD and that his possible condition might explain why his performance had not been satisfactory to either of them. (West Dep. I, Ex. 54.) West indicated that he would be contacting health care professionals to determine whether he had ADD and whether accommodations might be appropriate. (*Id.*) Within a few weeks, Dr. Susan Ahmari evaluated West. (*Id.*, Exs. 57–59.) She confirmed West's diagnosis of "nonverbal learning disabilities" and ADD, both of which might have contributed to his performance issues. (*Id.*, Ex. 58.) She stated that West "would benefit from an accommodation in his work environment," such as a "job that does not involve a lot of technological applications or changes in technological applications." (*Id.*)

Thereafter, West saw Dr. Patricia Bernbom, who concurred with Dr. Ahmari's diagnosis and concluded that West suffers from a "learning disorder not otherwise specified." (*Id.*, Ex. 61.) In her August 11, 2005 letter, she also stated that West had three additional learning problems, namely a nonverbal learning disability, processing speed deficit, and short-term auditory sequential memory. (*Id.*) Dr. Bernbom identified four specific accommodations that West's ADD required for his workplace, including: (1) a tape recorder for all training sessions

and meetings; (2) "one-on-one as well as small group training by a person qualified to teach persons with [his] learning disabilities"; (3) "a complete set of all forms and instructions to be used in each upcoming audit cycle," as well as other information; and (4) the opportunity to reverbalize and review oral instructions with his supervisors.  (*Id.*)

On September 30, 2005, West met with Wolfe, Ferdinand and Carol Barlow[5] to discuss Dr. Bernbom's recommendations.[6]  (Defs.' Facts ¶ 55.)  According to West, Wolfe "almost laughed" when they reviewed the four accommodation suggestions.  (West Dep. II at 54.)  Wolfe further stated that West "was not worth doing these accommodations as an employee," given the potential expense of certain options, such as hiring a tutor.[7]  (*Id.* at 54–55.)  Nonetheless, in response to the accommodation requests, Ferdinand provided West with relevant instructions and forms, among other things.  (Pl.'s Am. Resp. to Defs.' Facts ¶ 55(B)(4).)  She also reset West's computer and diligently provided West with additional training, although she did not have the qualifications West requested.  (Ferdinand Dep. at 71–93[8]; Wolfe Dep. at 82–83, 85–87; West Dep. I at 246–47, 250–51; West Dep. II at 54–61, 84; *see also* Pl.'s Am. Resp. to Defs.' Facts ¶ 56(A); Ferdinand Dep., Ex. 15.)

---

[5] Barlow was an assistant legal advisor until 2004 or 2005, at which time she became ISBE's Chief of Labor Relations.  She is now retired.  (Defs.' Facts ¶ 7.)

[6] The parties dispute whether West in fact requested the use of a tape recorder, as suggested by Dr. Bernbom.  (*Compare* Wolfe Dep. at 82 & Ex. 9 *with* West Dep. I, Ex. 62.)  Because the failure to accommodate claim is time-barred, as discussed below, this dispute is immaterial.

[7] Although ISBE attempts to deny these statements, its citations to Wolfe's deposition do not contradict West's testimony.  (Defs.' Resp. to Pl.'s Facts ¶ 10a.)

[8] We cannot confirm the parties' references to page 81 of the Ferdinand Deposition, as it is missing from the transcript provided by Defendants.

West testified that his short-term memory is affected by his ADD.  (West Dep. I at 168.) In addition, as a result of his ADD, he is slower when making decisions and analyzing what to do next when multiple steps lie before him.  (*Id.* at 172–74, 176–77, 181–82, 191–92.)  He also has difficulty asking questions and communicating overall, both in writing and expressing himself orally.  (*Id.* at 196–97, 200, 207, 210–11.)  He generally stated as well that there may be other "pieces of ADD that are affecting [his] everyday living that [he] is not aware of because no one has pointed them out."  (*Id.* at 209.)

**C.  Circumstances Giving Rise to the Settlement Agreement and West's Resignation**

Beginning in December 2005, West's attorney, Mary Denise Cahill, contacted ISBE to discuss a potential settlement agreement ("Agreement").  (Defs.' Ex. E, Cahill Dep. at 9–11 [hereinafter "Cahill Dep."]; West Dep. I at 274–75.)  West was concerned about his performance reviews and accommodation issues and sought reassurance that he would remain employed long enough to qualify for his pension.  (Cahill Dep. at 11; West Dep. I at 276.)  Cahill negotiated the terms of the Agreement with Barlow and the parties exchanged multiple drafts.  (Defs.' Facts ¶ 61.)  As part of the negotiations, West sought to retire from ISBE on June 30, 2006, a date selected by West and his attorney based on their understanding that he would then qualify for his pension through TRS.  (*Id.*; *see also* Cahill Dep. at 10–11, 13–15.)  ISBE agreed that West could return from his assignment in Springfield and, as of April 10, 2006, would work on a special project in the Chicago office through June 30, 2006.  (West Dep., Ex. 64.)

Although West may have been somewhat confused about the relationship between TRS and ISBE, Cahill was fully aware that TRS and ISBE are separate entities and, moreover, that TRS was "the proper agency to get information about [West's] retirement or pension plan."

(Pl.'s Am. Resp. to Defs.' Facts ¶¶ 64(B)-©; *see* West Dep. at 330–32.)  Prior to execution of the settlement agreement, Cahill did not ask TRS how long West needed to work to qualify for his pension.  (Pl.'s Am. Resp. to Defs.' Facts ¶ 65.)  Cahill based the June 30, 2006 retirement date on West's service date with ISBE.  (*Id.*)  The June 30, 2006 date, however, left West several weeks short of the service necessary to receive his TRS pension.  (*See* Cahill Dep., Ex. 8 (attempting to rescind the Agreement because West learned that he must work 72 additional days beyond June 30, 2006 to reach his 20 years of service).)

The Agreement required West to submit a resignation letter on or before April 3, 2006.  (West Dep., Ex. 64–65.)  On that date, Cahill faxed Barlow an unsigned copy of a letter for West's signature; Cahill understood that ISBE would administer the letter for West's signature.  (Pl.'s Am. Resp. to Defs.' Facts ¶ 67; West Dep., Ex. 66.)  Per the pending Agreement, West signed the resignation letter dated April 3, 2006 and agreed to retire on June 30, 2006, unaware of the problem with that date.  (West Dep., Ex. 65; Cahill Dep., Ex. 8.)

On the morning of April 3, 2006, Barlow faxed a copy of the Agreement to Cahill.[9]  (Cahill Dep., Ex. 4.)  Toward the end of that day, West was instructed to report to the personnel office, where Barlow and Connelly presented him with the Agreement for his signature.  (West Dep. I at 275–76.)  Although West knew that his attorney and ISBE had been negotiating a deal, he was not aware of all the communications between them or whether a final agreement had been reached.  (*Id.* at 295–96.)  Neither West's attorney, nor union representative, was available

---

[9] The parties dispute whether Cahill approved of that version of the Agreement as final and ready for execution.  (*See* Defs.' Resp. to Pl.'s Facts ¶ 18.)  When asked, Cahill testified that she felt it reflected the parties' negotiations and probably was the final product but that she "still needed to talk to [West] about it."  (Cahill Dep. at 43–44.)  Cahill did not recall whether she authorized Barlow to deliver the Agreement to West.  (*Id.* at 43–44.)

to accompany him to the meeting where ISBE presented him with the settlement agreement. (*Id.* at 290–94; West Dep. II at 20.) West testified that he was told he could not contact his attorney or wait for the union representative before proceeding. (West Dep. I at 292–94.) According to West, Barlow and Connelly indicated that West must sign the Agreement that very day, or "the deal's off."[10] (*Id.* at 292; *see also id.* at 293–94, 300–02.) West read the document, understood its terms, and signed it. (*Id.* at 283.) Nonetheless, West testified that he signed the document under pressure and "against his better judgment." (*Id.* at 300–02.) Among other things, the Agreement provided that, as an accommodation, West would work on a special project in the Chicago office until his retirement on June 30, 2006 and that ISBE would remove two negative performance evaluations from his file. (West Dep. I, Ex. 64.)

By letter dated April 19, 2006, West attempted to rescind his letter of resignation and withdraw his signature from the Agreement "due to the fact that [Cahill] had miscalculated and misunderstood how many years of [West's] work at ISBE was creditable with TRS." (Defs.' Facts ¶ 74; West Dep. I, Ex. 70.) Evans denied this request, however, because the Agreement was already in effect. (Defs.' Ex. F, Evans Dep. at 115 [hereinafter "Evans Dep."].) On June 28, 2006, Cahill forwarded ISBE an Amended Settlement Agreement extending West's employment through October 10, 2006, which would enable him to qualify for his pension.

---

[10] ISBE disputes these facts. (*See* Defs.' Resp. to Pl.'s Facts ¶¶ 19–21.) In her affidavit, Connelly states that she (1) does not recall presenting him with the Agreement; (2) never prevented him from contacting his counsel before signing the Agreement; (3) never denied a request to postpone the meeting to permit his union representative to participate; and (4) never told him to sign the Agreement or the deal would be off. (Defs.' Resp. to Pl.'s Facts, Ex. 1, Connelly Aff. ¶¶ 5–7.) Similarly, Barlow testified that she she did not meet with West at all to discuss the Agreement and she did not recall witnessing his signature. (Defs.' Ex. I, Barlow Dep. at 206–09 [hereinafter "Barlow Dep."].)

(Cahill Dep., Ex. 16.)  Evans responded on June 30, 2006, stating that the proposed Amended

Settlement Agreement was not acceptable and the Agreement remained final.  (Evans Dep., Ex.

13.)[11]

West filed a charge of discrimination with the EEOC on January 12, 2007.  *See, e.g.*,

*West v. ISBE*, No. 07 C 2994, 2007 WL 4162814, at *2 (N.D. Ill. Nov. 20, 2007) [hereinafter

"MTD Op."].  He subsequently received a right to sue letter, dated February 21, 2007.  (Compl.,

Ex. D.)  Among other things, he alleges that ISBE violated the ADA by harassing him when he

asked for a reasonable accommodation and by refusing to provide him with such an

accommodation.  (*Id.* ¶ 55.)  He also claims that the ISBE retaliated against him for requesting

reasonable accommodations.  (*Id.* ¶ 115.)

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law."  Fed R. Civ. P. 56©.  A

genuine issue for trial exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct.

2505, 2510 (1986).  This standard places the initial burden on the moving party to identify "those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue

---

[11] On June 14, 2006, Cahill wrote Barlow to pursue another option: Cahill's discussions
with Barlow and a SERS representative suggested that West might be able to buy back his eight
months of service credit from SERS and apply it to his TRS plan, thus rendering him pension-
eligible.  (Pl.'s Ex. 7; Pl.'s Facts ¶ 2e.)  Cahill asked Barlow to send a letter to SERS and TRS
representatives, verifying that West had transferred to TRS as part of a class of employees.
(Pl.'s Ex. 7; Pl.'s Facts ¶ 2e.)  ISBE did not send any such letter.  (Defs.' Resp. to Pl.'s Facts
¶ 2e.)

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

## ANALYSIS

### A.    Effect of the Agreement

As a threshold matter, we consider whether the Agreement's release provision precludes West's lawsuit, as Defendants contend.[12] As the parties acknowledge, "[e]mployees may waive their federal . . . rights in private settlements with their employers, provided that their consent to a release is both knowing and voluntary." *Pierce v. Atchison, Topeka & Santa Fe Rwy Co.*, 65 F.3d 562, 570 (7th Cir. 1995) [hereinafter "*Pierce I*"]; *see Hampton v. Ford Motor Co.*, 561 F.3d 709, 716 (7th Cir. 2009). West has presented several arguments contesting the enforceability of the release and we thus must examine the totality of the circumstances to determine whether the release was indeed knowing and voluntary. In doing so, we consider a number of factors, including, but not limited to:

> (1) the employee's education and business experience; (2) the employee's input in negotiating the terms of the settlement; (3) the clarity of the agreement; (4) the

---

[12] We assume for purposes of this motion that the Agreement is a valid contract under Illinois law, though we do not decide the issue at this time. (*Compare* Mem. at 4–5 (arguing that the Agreement is enforceable) *with* Resp. at 2–4 (questioning whether the Agreement includes sufficient consideration and ascertainable intent of the parties).)

amount of time the employee had for deliberation before signing the release; (5) whether the employee actually read the release and considered its terms before signing it; (6) whether the employee was represented by counsel or consulted with an attorney; (7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract or law; and (8) whether the employee's release was induced by improper conduct on the defendant's part.

*Pierce I*, 65 F.3d at 571; *Hampton*, 561 F.3d at 716–17. The parties do not dispute the first or eighth factor explicitly, and we shall focus below on other pertinent factors. Of course, no single factor is dispositive. *Pierce v. Atchison, Topeka & Santa Fe Rwy Co.*, 110 F.3d 431, 441 (7th Cir. 1997) [hereinafter "*Pierce II*"].

We find that there are several open questions of fact concerning the release, particularly as to the second, fourth, sixth and seventh *Pierce I* factors, which together preclude summary judgment on this issue. Cahill represented West during the negotiation of the Agreement, and thus, this second factor favors Defendants. For his part, West was not aware of the status of those negotiations when presented with the Agreement for execution. (West Dep. at 295–96.) The parties dispute whether Cahill approved of the Agreement as final, and there is no evidence that she instructed ISBE representatives to present the Agreement to West as final, as she had with his resignation letter. (Defs.' Resp. to Pl.'s Facts ¶ 18; Cahill Dep. at 43–44.)

According to West's testimony, which we must accept at this juncture without undertaking any credibility analysis, Barlow and Connelly told him that he must either sign the Agreement that same day, or lose the deal. (West Dep. I at 292; *see also id.* at 293–94, 300–02.) *See Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003) (warning of "the trap of weighing conflicting evidence during a summary judgment proceeding"). They told him that he could not contact Cahill before signing the Agreement and, moreover, that he could not wait for Paula

Stadeker, his union representative, before proceeding.[13] (*See* West Dep. I at 290–94; West Dep. II at 20.) Defendants concede that neither Cahill, nor Stadeker, were present to advise him concerning execution of the Agreement. Based on West's testimony and the evidence before us, a reasonable jury could find that Defendants pressured West—an employee with known learning disabilities, which affect his ability to make decisions and ask questions—to execute the release, within a matter of hours, without consulting with his representatives despite his request for such assistance. With respect to the fourth and sixth factors, we cannot conclude that West had meaningful access to his counsel before signing the Agreement and adequate time for deliberation. *Compare Pierce II*, 110 F.3d at 440 (noting that plaintiff appeared to face "inordinate time pressure" when given "only one business day within which to weigh his options"), *and Meyers v. Trugreen, Inc.*, No. 03 C 7570, 2004 WL 1146120, at *5 (N.D. Ill. May 21, 2004) (concluding that summary judgment was inappropriate where plaintiff had only three days to deliberate about execution of a release), *with Hampton*, 561 F.3d at 717 (affirming summary judgment where plaintiff had ample time to consider her buyout agreement and one month to change her mind after the enrollment period ended), *and Howell v. Motorola, Inc.*, No. 03 C 5044, 2005 WL 2420410, at *6 (N.D. Ill Sept. 30, 2005) (holding that employee's release was voluntary, in part because he "deliberated for twenty-seven days before signing" it); *Nobles v. Discover Fin. Servs., Inc.*, No. 02 C 2446, 2003 WL 22326584, at *4 (N.D. Ill. Oct. 9, 2003)

---

[13] Although Connelly stated that she did not prevent West from contacting either his attorney or union representative, she also does not remember having a meeting with him at all to discuss the Agreement. (Defs.' Resp. to Pl.'s Facts, Ex. 1, Connelly Aff. ¶¶ 5–7.) Barlow similarly does not recall the meeting West described. (Barlow Dep. at 206–09.) This testimony leaves open the question of how West received the Agreement for signature while at work, and Defendants have not provided an alternate explanation to contradict West.

(finding this fourth factor in favor of defendant where plaintiff had one week to study the agreement).

West has also identified a dispute as to the seventh factor, concerning the consideration provided in support of the release.[14] If West's assignment to a special project in the Chicago office through June 30, 2006 was an accommodation for his disability, as Defendants contend, it is not clear whether that assignment could also constitute consideration.[15] (Mem. at 10; *see* MTD Op. at \*6.) The Agreement also required ISBE to remove two negative performance evaluations from West's file.[16] (West Dep. I, Ex. 64.) As with West's final special assignment, it is unclear whether the promise to remove two evaluations could be sufficient consideration in exchange for West's promise to retire by a certain date, thus foregoing continued employment, and to release Defendants from any and all claims. (*Id.*) Neither party fully developed or supported legal arguments on these two specific consideration questions, and we decline to do their work for them. In light of this issue and the genuine questions of material fact noted above, we cannot conclude that West's release was knowing and voluntary for purposes of summary

---

[14] Although West attempts to frame the consideration question in terms of whether he purportedly gave "up his retirement benefits in exchange for two evaluations being removed from his file," that characterization is not entirely accurate. (Resp. at 4.) The Agreement does not require West to actively forfeit his retirement benefits.

[15] Additionally, the Agreement required ISBE to provide references containing only West's dates of employment; because agency policy already mandated such neutral references, however, we cannot say that this term provided any consideration for West's release. (West Dep. I, Ex. 64.)

[16] West further argues that ISBE violated the Agreement by failing to remove these evaluations. (Resp. at 4.) While there may or may not be a question of fact on that issue, it does not address the sufficiency of consideration but rather concerns a potential breach of the Agreement.

judgment.[17]

**B.    Statute of Limitations**

Having found that the Agreement does not prevent West from proceeding at this point, we turn our attention to his claims.  As we held in our MTD Opinion, however, several of these claims are barred by the applicable statute of limitations.  (MTD Op. at *3–5.)  For an EEOC charge to be timely, it must be filed within 300 days of the discriminatory act.  *Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004); *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 707 (7th Cir. 1995); *see* 42 U.S.C. § 2000e-5(e)(1).  West filed his EEOC charge on January 12, 2007, and thus, only acts occurring on or after March 19, 2006 fall within the applicable limitations period.

West's unsupported "estoppel" argument does not warrant discussion or alteration of our MTD Opinion.  (*See* Resp. at 2.)  Thus, for example, West's failure to accommodate claim—based on his 2005 request for accommodation, including the meeting of September 30, 2005—is barred as untimely.  Indeed, as held earlier, West may pursue claims only to the extent they are based on conduct occurring "around the period of the . . . [Agreement] itself."  (MTD Op. at *4.)

**C.    Disability Claims**

With the statute of limitations ruling in mind, we evaluate West's remaining causes of action.  West claims that Defendants harassed him and retaliated against him in violation of the

_____

[17] Given our decision that the release does not bar West's claims at this time, we need not address West's argument that he rescinded the Agreement.  (Resp. at 9–10.)

ADA.[18]

1.      **Hostile Work Environment**[19]

As with West's failure to accommodate claim, we conclude that his harassment claim is time-barred. In response to the instant motion, West describes the allegedly harassing conduct, all of which occurred prior to March 19, 2006. (Resp. at 14–16.) West's harassment claim stems primarily from his requests for accommodation and temporary assignment to the Springfield office. (*Id.*) For example, West identifies Wolfe's rude comments to him at their September 30, 2005 meeting as part of the basis for this claim. (*Id.* at 15; *see* West Dep. II at 54–55.) This conduct, however, falls outside the limitations period. Similarly, West worked in Springfield from early December 2005 through the middle of March 2006. (West Dep. II at 68–69, 95.) Although West contends that his Springfield assignment continued until April 10, there is no evidence before us substantiating that date. (Resp. at 15.) To the contrary, West testified that he worked in Springfield through the middle of March, then worked on site at a metropolitan high school, and ultimately returned to work in the Chicago office. (West Dep. II at 68, 95.)

Even if we assume that his work in Springfield through the "middle of March" included

_____

[18] Without deciding the question, we assume for purposes of this analysis that West is disabled.

[19] Although the Seventh Circuit has not formally recognized a cause of action for hostile work environment under the ADA, we assume such a claim exists for purposes of this motion. *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005) (assuming the existence of such a claim because "resolution of the issue has not been necessary"); *Silk v. City of Chi.*, 194 F.3d 788, 803–04 (7th Cir. 1999) (proceeding "on the assumption that a hostile work environment claim is cognizable under the ADA" and requiring the plaintiff to "follow the methodology already established in the parallel area of Title VII litigation").

dates on or after March 19, 2006, West's hostile work environment claim fails. To survive summary judgment, West must show "that a rational trier of fact could find that his workplace [was] permeated with discriminatory conduct–intimidation, ridicule, insult–that is sufficiently severe or pervasive to alter the conditions of his employment." *Silk*, 194 F.3d at 804; *Mannie*, 394 F.3d at 982; *see Faragher v. City of Boca Raton*, 524 U.S. 775, 786, 118 S. Ct. 2275, 2283 (1998); *Kampier*, 472 F.3d at 940. "A plaintiff establishes an alteration in the terms and conditions of employment by demonstrating either a tangible employment action, such as discharge or demotion, or a non-tangible action, such as discriminatory conduct that is so severe or pervasive as to create an abusive working environment." *Mannie*, 394 F.3d at 982; *see Faragher*, 524 U.S. at 786, 118 S. Ct. at 2283; *Silk*, 194 F.3d at 804. In addition, when evaluating the sufficiency of non-tangible action asserted by a plaintiff, the court considers various factors, such as "the frequency, severity and threatening or humiliating nature of the discriminatory conduct and whether it unreasonably interferes with [plaintiff's] work performance." *Silk*, 194 F.3d at 804; *Kampier*, 472 F.3d at 941; *Mannie*, 394 F.3d at 982.

The parties apparently do not dispute that West subjectively perceived his work environment to be hostile, particularly in Springfield,[20] and West argues that a reasonable person would agree with his perception. (Resp. at 15.) He contends that "he was subjected to severe, almost daily harassment, which was humiliating and threatening, and unreasonably interfered with his work performance," but he has not supported this assertion with evidence.[21] (*Id.*) He

---

[20] Based on the evidence before us, we observe that West never complained of any harassment, at any time while working for ISBE.

[21] West does not argue that his temporary assignment to Springfield was a tangible adverse action. (Resp. at 14–16.) Even if we concluded that it did constitute a tangible adverse

has not claimed that his supervisors made *any* derogatory, mocking or otherwise noxious comments on the basis of his disability.[22]  He was not physically abused or threatened by Wolfe or Ferdinand, his supervisors.  Although West argues that Wolfe humiliated him for asking questions, there is no evidence to substantiate this claim.  (*Id.*)  In addition, during his time in Springfield, West's salary and benefits stayed the same.  (West Dep. II at 80–81.)  West plainly was unhappy with his temporary assignment to Springfield; being away from home for four days a week and living out of a hotel surely disrupted his personal routine and presented inconveniences.  (*Id.*)  Nonetheless, there is nothing inherently offensive, let alone hostile, about Defendants ordering his *temporary* assignment to another office to work with his supervisor on correcting his audit deficiencies.  Indeed, Ferdinand testified that it was not unusual for employees to stay in Springfield to correct audits beyond the typical one-week peer review.  (Ferdinand Dep. at 122–25.)  ISBE required at least one other auditor, in addition to West, to remain in Springfield for an extended period of time to correct deficiencies.  (*Id.*)

If anything, West complains that he did not have enough contact with Wolfe while in Springfield.  (*Id.*)  West does not argue that Wolfe intentionally ignored him; he conceded that Wolfe "had other things to do."  (West Dep. I at 153; *see id*. at 152–54; West Dep. II at 104–05.)  Regardless, West met with Wolfe approximately fifteen times between December 2005 and February 2006, a span of around thirty working days, though some of these meetings were only a few minutes long.  (West Dep. II at 104.)  Wolfe forbade all auditors to ask questions of each

---

action, our decision would not change because, as below, West has not raised a question that ISBE acted with discriminatory purpose.

[22] Wolfe's insensitive comments at the September 30, 2005 meeting fall outside the limitations period and, moreover, do not appear related to West's disability.

other, and West thus was not singled out with this instruction.  (West Dep. II at 63–64; Ferdinand Dep. at 94–95.)  While West felt isolated in Springfield and testified that his stint there was a waste of time, he also thanked Ferdinand and Wolfe for their assistance.  (West Dep. II at 63–6, 106; Def.'s Facts ¶ 41.)  Having considered the evidence on the whole, we cannot conclude that a reasonable person would find Wolfe's spotty availability to be hostile or abusive conduct.

As a final fatal flaw, West has not argued or identified any evidence showing that Defendants harassed him because of his disability.  (Resp. at 14–16.)  "In addition to demonstrating harassment so severe and pervasive that it altered the terms and conditions of [his] employment and created an abusive working environment, [West] must demonstrate a link between the adverse treatment and [his disability]."  *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 564 (7th Cir. 2009); *see Roby v. CWI, Inc.*, 579 F.3d 779, 784 (7th Cir. 2009); *Kampier*, 472 F.3d at 940; *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005); *see also Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999) (stating that "[t]he complained of conduct must have either a [discriminatory] character *or purpose* to support a[n] [ADA] claim").  Looking to the events occuring after March 19, 2006—including his Springfield assignment, his resignation, his execution of the Agreement and his foiled attempts to revoke or amend it—there is no evidence from which a reasonable trier of fact could infer discriminatory intent.  The conduct at issue is neither inherently discriminatory on its face, nor tinged with discriminatory overtones.  *See, e.g.*, *Hardin*, 167 F.3d at 345–46.  As the Seventh Circuit has stressed, "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee" falls within a protected

class. *Beamon*, 411 F.3d at 863. Although we construe the record before us in his favor, West has failed to provide evidence from which a jury might infer harassment, based on his disability, sufficient to proceed with a hostile work environment claim.[23] Because he has not set forth specific facts raising a genuine issue for trial on this claim, we grant Defendants' motion with respect to Count I.

### 2.    Retaliation

Under the ADA, it is unlawful for an employer to retaliate against an employee who has opposed any discriminatory practice in the workplace or who has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" addressing such concerns. 42 U.S.C. § 12203(a); *see Twisdale v. Snow*, 325 F.3d 950, 952 (7th Cir. 2003) (observing that the anti-retaliation provisions of the ADA and Title VII are "materially identical"). Under the direct approach for proving such claims,[24] "a plaintiff must present evidence that he engaged in a statutorily protected activity, that he suffered from an adverse action, and that there is a causal connection between the two." *Anderson v. Foster Group*, 521 F. Supp. 2d 758, 788 (N.D. Ill. 2007); *see Hobbs*, 573 F.3d at 463; *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007); *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 758 (7th

---

[23] West did not argue that his hostile work environment claim should be treated as a retaliatory harassment action, rather than a disability harassment action. (Resp. at 14–16.) "Retaliatory harassment can rise to the level of a hostile work environment 'if it is severe enough to cause a significant change in the plaintiff's employment status.'" *Hobbs v. City of Chi.*, 573 F.3d 454, 464 (7th Cir. 2009) (quoting *Stutler v. Ill. Dep't of Corrs.*, 263 F.3d 698, 703 (7th Cir. 2001)). Even if we considered his claim as such, however, the result would be the same, for the reasons discussed above.

[24] West has not attempted to proceed under the indirect method of proof with respect to his retaliation claim. (Resp. at 17.)

Cir. 2006). Accordingly, West can defeat summary judgment by presenting "direct evidence (evidence that establishes without resort to inferences from circumstantial evidence) that he engaged in protected activity . . . and as a result suffered the adverse employment action of which he complains." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *see Boumehdi*, 489 F.3d at 792; *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720–21 (7th Cir. 2005); *Mellenthin v. SBC-Ameritech*, No. 05 C 3688, 2008 WL 4442590, at *8 (N.D. Ill. Sept. 29, 2008). West also "may offer circumstantial evidence of intentional retaliation, including evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Boumehdi*, 489 F.3d at 792; *see Kampier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007); *Rudin*, 420 F.3d at 720–21.

There is no dispute that West's request for an accommodation on the basis of his disability constitutes protected activity. *Cassimy v. Bd. of Educ. of Rockford Pub. Schs., Dist. 205*, 461 F.3d 932, 938 (7th Cir. 2006) (confirming that plaintiff "engaged in statutorily protected expression when he requested an accommodation"); *Sanchez v. City of Chi.*, No. 05 C 6801, 2007 WL 647485, at *8 (N.D. Ill. Feb. 28, 2007) ("Courts in this circuit, and others, have accepted a request for accommodation as 'statutorily protected activity.'"). As to the second prong, West contends that he suffered adverse action when he was "harassed after he requested reasonable accommodations," thus presumably referring to Wolfe's comments in their September 30, 2005 meeting, Defendants' refusal to provide the requested accommodations and West's temporary assignment to Springfield. (Resp. at 17.) West also argues that Defendants forced him to sign the Agreement and refused to accept his revocation thereof. (*Id.*) Even if we

assume that West established an adverse action, however, his claim fails because he has not provided direct or circumstantial evidence of a causal connection.

To demonstrate a causal nexus, West points only to the temporal proximity between the above-described events and his request for accommodation on September 30, 2005. (*Id.*) Because the issues surrounding the alleged failure to accommodate are time-barred, however, we cannot consider them as retaliatory conduct. We therefore focus on the conduct occuring around: (1) his execution of the Agreement, and his attempts to revoke it, in April 2006; and (2) his attempts to amend the Agreement in June 2006. Defendants allegedly harassed West into signing the Agreement and then would not permit its revocation in April 2006—a full six months after his request for accommodation. Defendants' rejection of West's efforts to amend the Agreement took place more than eight months after his accommodation request. Here, the timing of West's accommodation request and the allegedly retaliatory conduct several months later is simply too attenuated to permit an inference of discriminatory intent.[25] *Mobley*, 531 F.3d at 549 (stating that an inference could be drawn if the adverse action closely follows protected activity but "such a circumstance would be limited to matters occurring within days, or at most, weeks of each other"); *Smith v. Niles Twp. High Sch. Dist. 219*, No. 03 C 2984, 2006 WL 756071, at *15 (N.D. Ill. Mar. 22, 2006) ("But, as the time between the protected activity and adverse action increases, the suspicion of causation weakens.").

---

[25] Even if we considered West's temporary assignment to Springfield (which is time-barred, as discussed above) as an adverse action, the two-month time span between his accommodation request and term in Springfield is too long to raise a question on causation. *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008); *see, e.g.*, *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 952–53 (7th Cir. 2001) (concluding that the six-week span between plaintiff's filing of an EEOC charge and termination was insufficient).

In addition, as the Seventh Circuit has repeatedly stated, "[e]vidence of temporal proximity, . . . standing on its own, is insufficient to establish a causal connection for a claim of retaliation." *Mobley*, 531 F.3d at 549; *Burks*, 464 F.3d at 759; *Cassimy*, 461 F.3d at 938–39; *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005); *see Anderson*, 521 F. Supp. 2d at 789. West has not offered any additional legal or factual support to bolster his causation argument. *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 849 (7th Cir. 2007) (observing that "mere temporal proximity is normally not enough to create an issue of fact on causation in the absence of other evidence"); *Stone*, 281 F.3d at 644 (same); *see also Smith*, 2006 WL 756071, at *16 (noting that, beyond a timing argument, a plaintiff could set forth a retaliation claim with additional proof of causation). Accordingly, no reasonable jury could return a verdict for West on his retaliation claim.

## CONCLUSION

For the reasons set forth above, we grant Defendants' Motion for Summary Judgment and dismiss West's case. We also deny West's motion for oral argument as moot (Dkt. No. 157). It is so ordered.

Honorable Marvin E. Aspen
U.S. District Court Judge

Dated: November 2, 2009